Good morning. Good morning, Your Honors. May it please the Court. Alexandra Yates on behalf of Artez Brewer. Your Honors, we raised several issues in this appeal. I plan to focus my comments this morning on the Fourth Amendment question, ideally reserving a little bit of time for rebuttal. So unless the Court prefers that I proceed differently, I will jump right into the Fourth Amendment argument. Your Honors, the crux of the disagreement between the parties in this case is whether a territorial restriction on a location tracking warrant is a technicality that law enforcement can effectively ignore, or instead an integral part of the warrant that limits a search in a constitutional way. So in order to limit it in a constitutional way, it has to be part of the particularity requirement, right? So when we talk the Fourth Amendment, we talk about needing a neutral magistrate and probable cause, and those are not contested here. So I think we're just Your Honor, respectfully, there are two intertwined, but I think a bit distinct arguments. One is the particularity argument that when you have a location tracking warrant, the place to be searched is not the car, but the car over time and space. And so that this is a particularity problem. But also, after we filed our opening brief, but before the government filed their answering brief, this Court decided United States versus Henderson. And that adds a little bit of a different twist that I'm not sure is quite best characterized as particularity. Because what Henderson said, so what the government argues, and the Seventh Circuit said, was that venue limitations are technicalities. So the Seventh Circuit recently held in United States versus Brewer on all of these same facts that exceeding the scope of the state-imposed geographic limitation in the warrant did not So, we would, if we accept your argument, we would be creating a circuit split, then we would not be agreeing with our sister circuit in a case involving the same facts and parties. Is that just so that I set the stage? Is that right? Yes, but, if I may, Your Honor, yes. But I would suggest the Seventh Circuit has created the split because Henderson already exists in this case, and that's what this Court is bound by. So whatever the force of the government's argument in the Seventh Circuit, where Castetter was the prior case law, this Court now has Henderson. And what this Court said in Henderson is that venue limitations on search warrants are not ancillary restrictions. They are fundamental constitutional limitations on a warrant, on its scope. They implicate core concerns, original founding concerns that are Fourth Amendment concerns. So I think a helpful way to look at it, Your Honors, is under Henderson, had the Indiana state judge in this case authorized an extraterritorial GPS search, had she issued a warrant saying you may conduct location tracking outside of Indiana, under Henderson, that warrant would be void ab initio. This search would need to be viewed by the Court as warrantless. It cannot be the case, Your Honors, that where the judge authorized less, that law enforcement had authority somehow to do more. Now, had the state judge written that warrant, there might be some good faith arguments to consider, especially had my opponent raised those below. But here, we don't even have a warrant. The plain terms of the warrant limited it to Indiana. So I don't see how consistent with Henderson this Court could take the same approach as the Seventh Circuit did. Except for the use of a GPS tracking device requires a warrant. Yes. There. But how does the Indiana warrant not meet the requirements of the Fourth Amendment of being based upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the persons to be seized? So I guess I'm asking, is Henderson your legal authority that supports your argument that a state-imposed geographical restriction is required under the Fourth Amendment? Is that, or what is your legal authority? Our argument isn't that there's any defect in the warrant. The Indiana judge properly exercised her jurisdiction and issued a Indiana limited warrant. So what's your legal authority that supports your argument that a state-imposed geographical restriction is required under the Fourth Amendment? I think the same, Henderson doesn't limit it to state versus federal, and I believe that- But Henderson was a federal case, was it not? It was, but- And it was a federal warrant. It was, Your Honor. Okay. But two points. One, I think the jurisdictional limitations have even greater force when you're not just talking about magistrate, federal magistrate versus federal magistrate, but the territorial limitations of a state itself and where that state judge has authority. Second, Your Honor, post-Henderson, this court issued a case, I believe it was the Cooley case. We cited it in our reply brief. That wasn't about federal. That was Indian land versus possible state authority. And so I don't see that Henderson is limited to those facts. To answer Judge Callahan's earlier question, though, our argument isn't that there's any defect in the warrant. The law enforcement here went beyond the plain terms of the warrant. The warrant plainly only allowed- We're really back at Jones, are we not? I think we are, yes. We're almost back at Jones. I agree. I mean, what we have here is a warrant that authorized a GPS in Indiana. Yes. And anything that was done in Indiana was fine. Your argument is that location device, location information post-Jones has to be supported by a warrant, right? Yes. And here the warrant did not support any tracking outside of Indiana. Okay. So once you went either east or west out of Indiana, that warrant no longer authorized post-Jones the acquisition of location device. Precisely, Your Honor. Location information. Okay. So that gets us to Los Angeles some five days later, right? Three and a half days after he left Indiana, yes, Your Honor. Okay. All right. So it gets us to Los Angeles. And you have a bank robbery. Correct. Okay. I'm curious, and there's a lot of good Fourth Amendment issues here. I'm most curious to me that here they committed this bank robbery at the Banner Bank, and however law enforcement got there, they got caught. And during the course of the trial, in this case, Pollack was identified. Yes, Your Honor. So I'd love to address that. Why should information that came from that robbery, why should that be suppressed? So Your Honor, we would not object or we do not believe that in terms of fruits of this illegal search that any surveillance video, the bank teller's testimony, none of that about Ms. Pollack would, of course, need to be suppressed. Yes, but you're also, but you're asking for, well, I guess what, I guess our precedent provides that intervening events of significance may justify excluding a tainted statement or confession. United States v. Crawford, which was an on-bound decision. So assuming that the Indiana warrant was invalid or improperly executed, why doesn't Mr. Brewer's commission of a bank robbery in broad daylight not qualify as an intervening event of significance that purges the taint of the Fourth Amendment violation might have occurred? Because the only reason that law enforcement was there and observed him, and so their observations are of fruit, overheard statements that he and Ms. Pollack made, found the cash and the note right then and there. The only reason all of that happened was because GPS tracking directly led law enforcement to the bank. And I point the court... But they didn't have to commit another bank robbery. I mean, and they were in, the police were in a place that anyone could be in. So what you're saying is they had to be there accidentally as opposed to... Well, I would respectfully disagree that that's the analysis. I think the, I would suggest the attenuation analysis is whether the unlawful search significantly tended to direct the 54 to 57, 318 to 319. But the only reason law enforcement was at the bank and witnessed this was because of the unlawful search. Agent Peasley monitored Mr. Brewer over three and a half days and told law enforcement he's circling this bank. And so they went and watched him commit the offense. Why does the poisonous tree no longer become a good defense for you? Well, I mean, I think you have to have something that dissipates the taint, but there was nothing to dissipate the taint here. A criminal act couldn't by itself dissipate the taint, or I guess we'd never get to that. What if coming out of the bank, what if coming out of the bank, when Pollack was coming out of the bank, Brewer shot a bystander? And the officers were there, and they saw Brewer shoot the bystander. We still want the fruit of the poisonous tree because the officers were there only because they had that GPS device, the information? Possibly, Your Honor. That would be a more difficult question here. Why is it more difficult? Well... Because it's in broad daylight. They're in a place where they have a right to be, even though the reason they went there was because they were surveilling. And that's precisely it. The only reason that they were there was they were surveilling. It's just worse because someone got shot. I suppose not. But that really doesn't change the facts, to me. Well, I'm happy to... I'm hesitant to... I mean, it makes your argument less palatable, perhaps. That's right. But it doesn't change the facts. Because otherwise, it's just only a bank robbery. That's right. I guess the slight difference might be the whole purpose of the surveillance here was specifically to try to track him, presumably, to see if he was going to commit a bank offense. I know all the theories. It's foreseeable that someone will get shot in a bank robbery. I agree, Your Honor. I think in that case, the law enforcement's observations would need to be suppressed as well. Yes, Your Honor. Could I assume, because I think there are really interesting Fourth Amendment issues here, but if I assume that you've got a Fourth Amendment violation, and if I assume that the attenuation doctrine is a tough fit, given that we're looking for an intervening event and we're looking for, you know, did it tend to direct, let him write to the second bank robbery, is I think your argument. So if I agree with you on both of those premises, I'm not saying I do, but if I do, then we still come to the exclusionary rule. And the exclusionary rule is really reserved. It's a last resort. And I don't see, and we use it sometimes when we're really trying to deter misconduct. And this is a multi-state bank robbery spree, where there was a couple different units of law enforcement, and they're trying to coordinate and cooperate. It's not like they blew through the warrant requirement. They got two different warrants. The second one, of course, doesn't authorize tracking. I'll grant you that. But what misconduct needs to be deterred here? Well, so, Your Honor, the exclusionary rule is appropriate not just with deliberate misconduct or even reckless misconduct, but also gross negligence. And I think that's what we have here. The record's not developed this. I mean, in some ways, this is a good faith argument, because I'm not aware of any case, and I don't believe the government's cited any, where you have what's effectively a warrantless search, no exceptions apply, you know, assuming no exceptions apply, and no good faith, and yet the court doesn't apply the exclusionary rule. And the government has waived good faith here, and it doesn't apply under case law. Well, they do mention, they wave their arms a little bit about good faith. It's not their primary argument. And then I'm a little distracted by the Seventh Circuit case, which, after all, it's these parties and this, a different part of the same bank robbery spree. And they make a statement in there that the folks, the law enforcement out in California didn't know that the first warrant was limited to the state of Indiana. Apparently didn't know it was a state warrant. I have looked in this record. I don't see that here. It's not, because the government didn't raise good faith below. It's not just that they didn't develop it. They did not raise it at all in this case. So that's why it's waived, not that they haven't adequately waived it here. Moreover, on appeal, they haven't even made this argument that I think Your Honor might be suggesting about, you know, what the officers knew, because, of course, it's a reasonably well-trained officer. And so to answer the exclusionary rule question directly, this is precisely the type of case where we need this sort of deterrent. We have a core Fourth Amendment concerns here in terms of going beyond the scope of a warrant. And at best, law enforcement simply didn't read a warrant that authorized tracking of very sensitive data. I think that's precisely the type of conduct that this court would want to encourage. Apparently there were other warrants in this group. I looked at the Seventh Circuit case. It's something that was an anomaly. They described it as an anomaly on this warrant, that the other ones did authorize going over state lines or something. I'm not sure how to address that, Your Honor, because, again, the government didn't raise this below, so we haven't had an opportunity to do this. Let's put note in it. It refers to it as an anomaly that a state court judge wouldn't have limited the search to the state she's in, which is curious. The earlier warrants apparently were silent, and this one actually limited it. So it is a curious note. If we're talking about warrants, what about the federal search and seizure warrant that they had? Isn't that another attenuation? No, Your Honor, because it has nothing to do with this type of search. That was purely a physical search warrant for the car. It did not authorize GPS tracking. But they went and they got the search warrant for the car. They found the car. They found Brewer in the car. Brewer and Pollack fled the car. The cash was near the car. I mean, they're there with the search warrant. Now, whether or not that validates what they did or it cuts off the defense of the poisonous tree, it has some significance, does it not? Well, I think the significance is in our favor, Your Honor. It shows precisely that they had time to go and get a warrant after he left Indiana, but they didn't get the right one. And so their execution of a search on the car postdates the… But what warrant would have you – what warrant if you were – if you had to do this over again and you were Agent May in Los Angeles working with the L.A. sheriffs, what warrant would you go and get that morning? Well, so what – it was – I believe Agent Peasley went and got the June 9th federal search warrant. He got it under provision of Federal Rule of Criminal Procedure 41, which authorized a search. Federal Rule of Criminal Procedure 41 also could have authorized under a different subsection a multi-jurisdictional GPS tracking search. Agent Peasley did not get that warrant, and that's a problem. Yeah, but you would be here arguing that they only got that warrant because they got illegal – they improperly got GPS tracking out of the Indiana warrant. I mean, you would have still been arguing the fruit of the poisonous tree. You know, I would have made whatever arguments I might be able to make for my client, but I think they would have had less force. I did hope to reserve some time, Your Honors. Well, you're actually over time. I see. I will give you some rebuttal time. Let's hear from the government, and I suspect I'm going to want to ask you and probably other panel members some additional questions, and maybe about the sleeping juror and the council issue. But we'll get back to you on how much time. I appreciate that, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Bram Alden for the United States. I'm sorry, your name again? Bram Alden. Okay, thank you. To address the Fourth Amendment issue, I want to go from two different perspectives, one being Judge Kristen's question about whether the violation of the warrant here was a constitutional violation, and then second, from Judge Fisher's perspective, about the attenuation doctrine. So, first, there was no constitutional violation. As Your Honor has pointed out, Judge Kristen, there are two real requirements under the warrant clause. One, the probable cause requirement, and secondly, the particularity requirement. In the context of particularity, all of the circuits to have addressed this question or similar questions have held that what has to be particularized is the object to be searched. Here, the car, the silver Volvo. The first warrant wasn't a search of the car. It was a search of the car's track. It was a tracking of the car. Correct, which under Jones is considered to be a Fourth Amendment search, and so what the warrant needed to describe with particularity was that car, and it did. Well, why didn't it need to? Opposing counsel's argument is that what it needed to describe is the area to be searched, and that it was limited to Indiana. So that geographical limitation is not actually something that any court has recognized as a constitutional principle. It's something that is merely a creature of statute. You know, I think I could maybe be more inclined to agree with you if it wasn't for the factual circumstances in Jones where they had this D.C. warrant, and it was out of date, but not only did the time elapse, they went and they put the tracker on the car in Maryland. I mean, they literally had those same facts that we have here. Well, I think that aligns with the Henderson decision in that those two cases are cases in which effectively at the time of installation or in Henderson during the actual search itself, there was no authority at all to actually engage in the search. And in Jones, this was a trespassery violation because at the time of installation, there was no warrant that allowed it. Notwithstanding Jones, the Faulkner decision actually that came after Jones out of the Eighth Circuit held that even though a tracker was installed outside of the county prescribed by the warrant, it was still permissible because it was within the time limit that the warrant provided. Here, there was no trespassery violation as in Jones because at the time of installation, it was installed in Indiana and it was allowed for up to 45 days. This also doesn't align with Henderson because in Henderson, the problem was that the warrant was void ab initio, that's this court's language, in that no judge could have authorized a nationwide computer search of the sort that was conducted. So is it your position that a state court magistrate in Indiana had the authority to authorize an out-of-state search? I think that's actually, one, unclear from the record, an Indiana law, but two, I would point the court to appellant's opening brief at page 21 where the appellant actually cites Indiana law and it says that whether Indiana law permits a state judge to authorize an officer to execute an extraterritorial search is beside the point, and then in parentheses, though notably, it does not. In other words, it does not permit a search under the defendant's reading of Indiana law. But if you look at Indiana law, the Indiana statute doesn't actually say whether or not this could happen. Really problematic proposition, Counselor, and your brief alludes to the fact that you backed away from this proposition. I don't think you really need us to rule with you on this point in order to prevail today, but I'm from Alaska and I have this image of a cracking ice, so perhaps you want to. So, Your Honor, the only reason I would actually preserve that argument now is because the Seventh Circuit decision after I filed my answering brief did point out, as you have noted today, that this case involved multiple Indiana warrants that apparently did not have a geographical limitation. So there is a question, at least under Indiana law, whether that's permissible. I would also note, though, that under the federal rules, under 41b-4, a nationwide tracking warrant was something that a judge could have authorized. A federal judge. Correct. Which is why I look to the federal warrant, and, of course, it's a different kind of warrant. It's the wrong warrant. Absolutely. I think that the reason I would distinguish Henderson in part based on the proposition that a federal judge could have issued this warrant is to say that this was not something that no judge was capable of doing. Well, yes, but that's almost always true when we see warrant cases where the scope of the warrant has exceeded. But in this case, it is really doubtful to me that an Indiana judge would have authorized, had she been asked to authorize a nationwide warrant, that she would have done so. But I have these burning questions about the two other issues in this case. Are you going to turn to them? Yes. Can I ask a couple of them before we move on to the other ones? Okay. So what is your best legal authority that supports your argument that a state-imposed geographical restriction is not required under the Fourth Amendment? Brewer. Brewer. The case out of the Seventh Circuit. And then I would cite to this court's decision in Artis, which also came out after our answering brief was filed. But in Artis, what happened was... I think I know. I will not go into detail. So then, given the explicit language on the search warrant limiting the use of the GPS device to within the state of Indiana, how can the good faith exception apply here? I think that the good faith exception would require a remand for further fact finding. I note that the court has alluded to the Seventh Circuit's decision where the Seventh Circuit described whether officers may not have even been aware of the limitation. And I do acknowledge that is not in the record here. It would necessitate a remand to bring out people from Indiana and to have officers testify as to what they knew at the time of the GPS track. Okay. And in terms of the attenuation argument, briefly, before we go to the other issues here, I asked counsel for the appellant about United States versus Crawford and whether there's intervening events. What's your... Her, obviously, argument is they wouldn't have been there but for the tracking device. And so, therefore, everything after that, whether it be someone shot right in front of them or the robbery in plain daylight, what's your response to that? So, I agree with Your Honor and the hypotheticals that were asked. I would point to the Smith case, which specifically says that the but-for cause test is not the attenuation test. And instead, this court looks to, under Smith, and the site for that is 155 F3rd 1051, that... Could you say the site again? Sorry. The site is 155 F3rd 1051. Thank you. That it is not a but-for question but, instead, a question of whether the illegality tended significantly to direct the investigation to the specific evidence. And Smith holds that whether the initial illegality led directly to any of the evidence is also the question. So, here... But that's the question I asked earlier, tended to direct. The beeper is leading them right to the bank across the country. That's why it's a tough argument. And I think the intervening events... So, the beeper led them to the bank. There's no question of that. The intervening events is what happens when they get to the bank because that's still four hours before the bank is robbed. Officers arrive on the scene at 10 a.m. on June 10, 2016. The bank is not robbed until just before 3 p.m. So, in that time, there are a sequence of intervening events. Officers with on-site, eyes-on surveillance watch defendant case the bank. They watch him walk around. They watch him park and re-park his car around the bank. They watch Pawlak jump out of the car and run into the bank. That is also captured on surveillance video. There is then a bank robbery. I believe the robbery itself is an intervening event of significance. After which, there is a car chase followed by an apprehension, followed by bringing the defendant to a police headquarters where he confesses. So, I think all of those events are intervening events that do contribute to attenuation, and that otherwise, under the hypotheticals that both you, Judge Callahan, and you, Judge Fisher, were asking, that this kind of a but-for, they wouldn't have been on the scene, could allow the defendant to get away with any crime. Okay. I'll let... I'll put the ball back to Judge... Thank you. ...Kristen for the other, the court, the trial issues. Well, I'm concerned about the sleeping juror issue and the request to substitute counsel. In particular, I've read the transcript. I'm sure we all have the transcript for both pieces of the trial. The sleeping juror allegation is concerning, for sure, and there weren't any written instructions here, right? I don't know whether... There were written instructions. I don't actually remember whether they went back with the jury. The record is that they did not. So, I'll double-check, but the record here that we have, the representation is the written instruction. The jury did not have written instructions. I know that is the representation in the reply brief. I don't recall. I do remember a discussion about that during trial. I don't remember whether they did go back. But I would say, Your Honor, if you're concerned about... Was there trial counsel? I was, along with one other prosecutor. So, what exactly, on the sleeping juror thing, what exactly did the court do that, I think, was it more than one time that... I saw something in the record that the court said, well, just because their eyes were closed, I don't think they were sleeping or something. Yes. So, what exactly did happen when it was called to the court's attention? Just that, Your Honor. It was raised twice. Remember, this is a trial that lasts all of one and a half days. And there was no defense case, so there was a prosecutor standing in front of the jury for most of this case, watching as well the jury and the judge. From my recollection, I did not see a sleeping juror, neither did my colleague. I acknowledge that there wasn't much of a record made by the court. I would also say, though... Well, when it comes to the instructions, there wouldn't have been a prosecutor standing in front of the jury when the judge is instructing the jury. That's correct. And there's no record that the judge followed up at that point. And the allegation is there's a juror who slept through the instructions. That is correct, Your Honor. The instructions and the import of the instructions, particularly with respect to the elements of these crimes, were also things that the prosecutor went through in detail during his closing argument, my colleague. And you can find that in the record as well at ER 702-712, where the elements, as the court instructed, were also part of the closing argument. What about the right to counsel, the substitution of counsel? So I think the point I would make about the substitution of counsel, as well as the point about the sleeping juror, is really that what this court should rely on is harmlessness. And I think the reason the defendant didn't even argue these issues today is because if we redid all of this, the evidence here is so overwhelming. Well, that doesn't mean he doesn't have a right to counsel. I'm not disputing that. I think that the harmlessness— It's interesting, if nothing else, to argue at the sentencing phase. He didn't have a defense. Really? He didn't put one on. But the judge went straight to that. The competency of defense counsel. He never inquired about whether there had been a breakdown in communication. And one might have asked, why are we even going to trial here? We know after the fact that the defendant took the position that the government's offer wasn't even presented to him until the day that it was going to expire. I don't know if that's true. I don't mean to intimate otherwise. But it does seem to me to be a case where one would wonder why this case was even going to trial. Hence, was there a breakdown in communication? And there is not a peep of that in the record. So the harmlessness analysis, obviously, I think still does apply. I don't want to go right to that. I would say the factors this court looks to in whether there was any conflict of counsel that necessitated substitution or a further inquiry by the court are the factors that are enumerated in the cases both parties cite, Velazquez, Walker. One, timeliness. And I do not agree that this was raised properly to the district court in a timely fashion. It was something that was raised on the first day of trial after the defendant's letter to the court was rejected. And the court in rejecting the letter was simply following the very rules of procedure that apply in the district court. The same thing happened on appeal. In fact, at docket numbers 33 and 34 of this court's docket. No dispute. He doesn't have to consider the pro se letter. Okay. Then, Your Honor, at that point, this court has held repeatedly that claims Did counsel make a motion at that point? No. Counsel never made a motion. So why is the defendant talking when he has a lawyer? He asked to be heard and the district court allowed him to on the first day of trial. At that point, none of the claims that he raised in his letter were claims he articulated to the district court. It was simply a general discontent with his lawyer, which this court has held is not enough. Melinda Sanchez says that that He says that he will not excuse himself. I've asked him to excuse himself. He will not excuse himself. There's a reason to at least inquire of defense counsel about whether there's been a breakdown in communication. I think what happened here Does the law require that? I'm not asking a question. I really mean to. I'm sorry. Doesn't our law require that? At least that? I think what the law requires is what the district court whether the district court under the circumstances in front of it can simply conclude that this is the defendant's general unreasonableness, which is the Melinda Sanchez language. It doesn't say, though, it would have been more helpful if Judge Real had said, this is the day of trial. You've been obstreperous. And I think that this is just one more of you're dragging your feet. I see nothing here. Is there anything, you know, what, you know, He doesn't exactly go that far. Right. I agree, Your Honor. And I think that. He doesn't go near it. All he said was that the defense counsel was competent. He doesn't allege with any specificity problems that he had, the same kind of problems he articulates in his letter. And so the question is under the circumstances where he is simply saying, I don't agree with my counsel. I've had issues with my counsel. What does an abuse of discretion to hold that the district court abuses discretion, what does that mean? And I think the Melinda Sanchez case is on point. Judge Real, rest in peace, is not one to like to give any more reasons, was not one in his lifetime to give more reasons than many times that we wanted more reasons than he actually gave. But, you know, obviously as a prosecutor, your job is to prosecute people and to, you know, and to follow the law and to, you know, only prosecute those people that you feel that you have the evidence. But it seems that, you know, I can tell by the, you know, that you obviously know what the law is here. Why are you, why were you sitting there like a potted plant when you see these issues about sleeping and, you know, that knowing, I mean, the state court would call it a Marsden hearing or whatever, that, but the, why are you not saying, well, your honor, it just seems like it would make some sense right now for the court to go into this a little bit further because those are, I mean, these are the type of things that can be, you know, they can be game, you know, you can get a conviction and then they can uproot everything. If I were doing it over your honor, I would have made more of an effort to say something. I think the question now is whether this necessitates a retrial and under shall remand issue. Can anything be remanded? Can anything be ascertained because judge reels passed away? What a remand, what would a remand, what could a remand accomplish? I don't think it could accomplish anything with respect to the sleeping juror issue. I did actually at one point during trial say, I didn't see a juror sleeping either. I do think I didn't say anything at the time of the statement that council made that the juror was sleeping during the instructions. I think that is when I said something, I'm not sure your honor, at which point, whether it was the first or the latter, but I think it was the latter time that I said I hadn't seen anything. You may be right. I'm not positive about that. So you may be right that it was actually the first time that the issue was raised. I don't, I don't recall. Well, are we bound by, I think judge real says something like, well, okay, even if the eyes are closed, that doesn't mean the person is sleeping. And I didn't see anyone sleeping. Is that some sort of finding that they weren't sleeping or what, what, what do we do with that? I think that should be construed as a finding that there was not a sleeping juror or that the court was unaware of a sleeping juror. And if the court is troubled by these problems, and I admit this was not a perfect trial by any stretch, and I would have loved had there been more of an inquiry of some of these issues, but the question on appeal is, is this something that we should redo? And I think the reason the defendant doesn't bring these issues up is because there is no hope of anything better, any different result coming from this case. I see my time is long up. I, if there are no further questions. Thank you. Okay. So, um, thank you. We took you four minutes over, so I'll give you four minutes. Thank you, your honors. One brief though, maybe I think probably I don't, I think that the panel would like you to talk about the sleeping and the sixth amendment issue. I'll go right to that, your honor. And let me clarify a few points in the record, if I may, on the, on the sleeping jurors excerpt of record six 99, the written instructions were not given to the jury. Um, also at excerpt of record seven 35, this was when the second instance of sleeping jurors arose. And this is of course the more important one, because this is the one that dealt with the instructions. So there can't be any question about whether this was an important moment in time. Um, the only, the judge made no response at all. And the only response from the prosecution was quote, I didn't note it, which, uh, might be construed as, I didn't see anything, maybe more generously created a dispute of fact that needed to be resolved. Um, so, so that, that's the record on sleeping jurors. Uh, and of course, um, I didn't address these six 99 show as to not sending the written instructions. Um, you know, I don't have that in front of me. If I recall your honor, that was where the one of the one or both of the parties asked if written instructions could go back to the jury and the judge denied that request. Um, so I don't think there's any dispute in the record that the jurors did not have the written instructions. Um, you run these, these three, um, the three issues that we raised that deal with the, uh, the trial itself were specifically selected because they are structural errors. Um, these are not ones that are, that are subject to harmless error. I didn't get up here and address them because you know, we can only address so much, but, um, but, but these aren't ones that are susceptible to harmless error review. If you don't have a conflict free counsel, uh, then that's a structural error. If a juror slept through the instructions, that is a effectively structural error. Um, so there isn't a harmless and error outset analysis to be had. Um, on the Marsden point, just, just in terms of what Mr. Brewer could or should have done. Um, we called it in our pride, the government's position on our reply brief somewhat Kafka ask because the situation was Mr. Brewer writes a letter to the court three and a half weeks before trial saying I have all of these problems. He shouldn't be writing to the judge. We all know that. And that is probably not he's probably, he seems, and he shouldn't have been talking to the judge. So he's clearly one of those defendants that wants a lawyer, but also wants to say whatever he wants to say, which we've all had those people before. And, but I'm curious why his counsel, if there really was a breakdown that I've had counsel many times called to my attention, your honor, you know, we, we'd like to go on camera because you know, my, uh, I think that there's a breakdown, but counsel didn't say that. No, that didn't happen. Your honor. Um, and, and when Mr. Brewer gets to court, of course is his first opportunity after writing the letter, it's clear. He doesn't even know what happened to the letter. Um, the letter of course was not returned to him. It was sent to defense counsel and instructed defense counsel. It's your responsibility to raise this. And Mr. Brewer represents to the court, uh, at, at that oral opportunity, he says, I've been asking this guy, you know, I've been, I've been asking him to raise this and he won't do it. I'm not sure what else Mr. Brewer could have done. And all of this, of course, just evidences the very nature of the, of the conflict here. I'm looking at, if I forget, forgive me, but at ER 699, I want to make sure. Yes. I'm sorry. I don't have that in front of me. I do. Um, it says that Mr. Alden says the government would propose that the jury instructions be sent back to the jury during deliberations. The court responded. No, I don't do that. As a matter of fact, if they want the instructions, they can come back and get them if they don't understand them. Did the jury ask for any written instructions after that? No, Your Honor. I know that I am over my time. Does the court have specific questions for me to address on the sleeping jurors or the Marsden issue? I do have one question on the, uh, council. What should the district court have done? District court should have had a hearing. A hearing and do what? That they hadn't already done. Yes, Your Honor. Uh, the court didn't do anything. The court simply talked to the defendant. The court did not ask a single, the court acknowledged he got the letter, right? Um, the court, uh, you know, I'm not, I'm not even quite sure of that. You're going to have to have a hearing. Why would he have to not some separate hearing, but ask questions. So what this court said in the wind case, and he has to make an inquiry, an inquiry, and the Adelzo Gonzalez case has to question the attorney or the defendant privately in depth using targeted questions. And this court has been clear that open-ended questions sometimes aren't enough here. There were no questions at all. So the court needed to do something to get to the bottom of this. And instead the court talked to the defendant said, your attorney's competent. I don't know what you want him to do. I don't know. Doesn't ask the defendant and doesn't, you know, you haven't given me anything that would suggest he's not representing you. That's right. That's a, that's a competence inquiry, which this court has been clear in a line of cases is not the right approach. But he, he didn't say anything about, I, you know, I want to testify and he won't let me testify or I want to do this or I, or he doesn't visit me at the jail or he doesn't do this or he's not ready for trial or. Well, so Mr. Brewer. He's been to more than one lawyer. Not intentionally, Your Honor. And I think that's an important point. I appreciate you raising that because he originally had a deputy federal public defender who then went out on a family leave. And so then new counsel substitute in Mr. Brewer made clear he had no problem with that other attorney. So this is not, this is not a client who cannot make it work with an attorney. He was quite specific about his complaints in the letter. Of course, Mr. Brewer had no way to know that the, that the judge hadn't read those. He didn't know what happened to the letter. It appears from the record when he got to court. I do think there was some obligation on the judge to try to find out what was going on here. Mr. Brewer was making clear that there was a communication problem at minimum and not a single question was asked. Well, except for if, even if it, that, you know, a lot of times when you get this stuff from people, people say the darndest things and you wouldn't always want a judge to read something that your client wrote to the judge apart from you, because sometimes they, they confess or they, you know, they say, and by the way, you know, I've got a body buried over here. Could you do some, you know, I mean, so courts, when you have counsel, we're pretty careful not to interfere with that relationship. And as defense counsel, we appreciate that, that your honor. And I, that's perhaps why this court's line of cases says the inquiry can be made of the defendant or of counsel. But the court had an obligation to ask someone about this relationship and the court didn't, didn't ask a single question. I guess that's what I'm still struggling and trying to figure out what you want to discord to do and what you want future courts to do under circumstances like that. Do they have, do they, does the court ask questions of the defendant outside of the presence of counsel? In other words, in camera investigation, does the court have asked counsel questions, which they didn't appear to do here. They didn't ask counsel any questions. So what is it that you want the courts to do? Yes. And we're not asking this court to break new ground here. We simply want courts to do what this court has already held. Ask specific questions to try to understand the problem of either the defendant or the, or defense counsel, usually outside of the presence of government counsel would be the appropriate approach. That, that, that's not breaking new territory. That is simply what's required under the line of authority. Even that wasn't required. You'd have a much tougher argument if the judge had said it's the morning of trial, you're too late and there's no motion. I do think that we would still under the Walker case have a good argument, but it would be harder, Your Honor. But yes, the court clearly did not rely on timeliness and under Walker and Velasquez that that really falls away in this court's analysis. No matter what this court had done or met, what, what future courts do. If, if we're sitting here reviewing a question like this, it's still an abuse of discretion review, is it not? It is abusive of discretion, but I would submit Your Honor that a district court abuses its discretion when it doesn't ask for any information with which it can exercise its discretion. Here, the court didn't have information to exercise discretion. And this court's case is, I understand what you're saying. Thank you, Your Honor. All right. Thank you both for your argument in this case. Thank you. The court's in recess until tomorrow at 9 a.m. All rise. The court is adjourned.
judges: Fisher, Callahan, Christen